MARK SCHIFFMAN and Another, Appellants, *v.* HARRY APPELMAN and Others, Respondents, Impleaded with WILLIAM I. ALPERT, Defendant.

First Department, May 15, 1936.

*Leo E. Sherman,* for the appellants.

*N. William Welling* of counsel [*N. William Welling,* attorney for Harry Appelman and Delamater Square Realty Corporation; and *Francis E. Rivers,* attorney for Maurice Finkelstein], for the respondents.

McAvoy, J.   This suit seeks to rescind a contract by the terms of which plaintiffs sold to the defendant Harry Appelman one-half of the capital stock of the Delamater Square Realty Corporation. The complaint is based on charges of fraud and conspiracy upon the part of the defendants which misled and coerced plaintiffs into selling their stock.   The Schiffmans (plaintiffs) and the defendant Appelman were the only stockholders of the Delamater Square Realty Corporation.   The corporation owned a building on West Fourteenth street near the river front.   The tenant was dispossessed and the question arose between the stockholders as to what should be done with the property.   There had been a restaurant in the building.   The Schiffmans had no funds and Appelman had plenty of money.   At first Appelman suggested that the stockholders take over the restaurant and operate it and he offered to lend money to the plaintiffs for their capital contribution to the venture.   The plaintiffs were unable to agree with this suggestion.   Thereafter, arrangements were made for the organization of a new corporation by Appelman.   The Delamater Square Realty Corporation with the consent of the plaintiffs leased the premises to this new corporation, the Delta Lunch Company, Inc., for eighteen months. The purpose of the organization of the Delta Lunch Company, Inc., was under a reasonable inference to limit Appelman's liability on the expenses for running the restaurant.   The purpose of giving all the property into Appelman's control for eighteen months was to enable Appelman to ascertain the possibilities of business so that he could report thereon to his associates, the Schiffmans.   The consideration for this eighteen months' lease was the payment of all the expenses on the property except the moneys on the second mortgage, which was owned by Appelman, and the waiver by Appelman of any claims under the second mortgage until the expiration of this lease.

Giving the testimony the construction most favorable to the plaintiffs under the dismissal of their complaint, it appears that because of the repeal of the Eighteenth Amendment, Appelman was convinced that considerable money could be made out of this

building again and he resolved to take all measures that he could to induce or compel the Schiffmans to sell out their interest in it at his figure, namely, $9,000. He and his agent Finkelstein definitely represented that the property and restaurant were losing propositions and made objections to showing the books of account. He or his agent Finkelstein brought an action to dissolve the Delamater Square Realty Corporation on the allegation that a foreclosure of the second mortgage on the property was imminent, when he must have known that a part of the arrangement under which he was given control of the property for eighteen months was that in writing he had waived all claims for defaults under that mortgage for that period. Furthermore, he began the action to dissolve the corporation long before such an act could be reasonably interpreted as being taken in contemplation of a foreclosure at the end of the lease. He might be found to have induced the prior owners of the property to serve a summons on the Schiffmans and himself for substantial damages arising on claims alleged to have arisen before they lost their interest in the premises, and later, as a part of the consideration for the transfer of this stock from the Schiffmans to himself, he volunteered to procure the discontinuance of that action, ostensibly brought by people who were hostile to him, and succeeded in procuring that discontinuance for which nothing was paid so far as appears. As soon as he received the eighteen months' lease, he secretly made a twelve-year lease with the same corporation of these very premises on terms that on paper at least appeared very profitable, and all this at the same period that he was representing that the whole venture in the premises was a losing one. At about the same time that these acts were occurring, he secretly negotiated with the first mortgagee for a reduction in interest in return for an agreement to make large amortization payments on principal. It was obvious that to bind the corporation to these onerous amortization payments, if the property was of little value as he was representing, was to make it certain that the plaintiffs would be wiped out of their equity by a foreclosure at any time since, on Appelman's representation, there was no possibility of there being any money to make these amortization payments.

In respect to this modification of the first mortgage it is proven that the modification was made after the second mortgage which Appelman was holding had been pledged in escrow for the payment of the $9,000 on the purchase price of the plaintiffs' stock. Increasing the burden of the first mortgage, of course, at this time, without notice to the Schiffmans tended materially to decrease

the value of the second mortgage which had been put up as collateral for the payment of the contract, the rescission of which is involved in this suit.

Several months after this contract went through there were further transactions which showed how lucrative the investment in the property was. By virtue of a paramount lease to the Munson Bar & Grill, Inc., a lease of the entire premises was made by the Munson Bar & Grill, Inc., to Delta Lunch Co., Inc., on September 4, 1934, nine months after the contract in suit was entered into. Also on September 4, 1934, the cafeteria in the building was sold at a price in excess of $11,000. Whether these transactions were in the minds of the defendants on the previous January might possibly have been developed, had the whole case been heard, and had the defendants been called as might have been expected and duly cross-examined on their conduct of the transaction in suit.

What we say here to portray the situation is not to be taken as an expression of opinion as to the truth of any of the testimony given by the plaintiffs. It is set out merely as an interpretation which may be put upon the testimony at the end of the plaintiffs' case when no denials or explanations had been offered.

The respondents on this appeal argue that none of the acts charged in themselves are illegal. They assert that Appelman may well have forgotten that he signed the waiver and that, therefore, there was nothing wrong in threatening to foreclose prematurely. It is maintained, too, that there is nothing to show that they really instigated the law suit brought by the dispossessed tenants, and that there was nothing wrong or illegal in bringing a dissolution action prematurely. As matters stood at the end of the plaintiffs' case, however, there was certainly testimony that Appelman had represented that the property was going to be a total loss and that the plaintiffs should take $9,000 and get out or they would get nothing. It may be that they should have stayed in and fought even though they thought that the letter signed by Appelman waiving the interest on the second mortgage had been lost and that the proof of such a waiver would be well-nigh impossible. Though the letter had undoubtedly been signed, they had every reason to think that both Appelman and the defendant Finkelstein would deny all knowledge of it. This in itself is a highly suspicious circumstance and one which tended to coerce the plaintiffs into agreeing to this contract. If at the time all these claimed " legal " acts were taken by Appelman and all these threats and representations and declarations were made Appelman well knew that the property of the corporation could be expected ultimately to yield a substantial income per

annum, it was Appelman's duty as the officer and stockholder in control of the corporate property for those eighteen months to work for the benefit of the corporation and not for the benefit of himself. The accepted morals of the market-place are not the test of conduct of one who is a *quasi* coadventurer.

We conclude that the inference is inescapable that Appelman was attempting to freeze out his associate stockholders. It may be that the relation of one stockholder to another is not that of a fiduciary. However, here there were misrepresentations as to the income possibilities of this building in the future, there was a threat to bring a suit which in effect Appelman had agreed not to bring, and finally there was a situation in relation to this lawsuit of the tenants from which it might well be inferred that Appelman was instigating it and that it had no basis in fact. We think that such conduct if established on the whole record would entitle the plaintiffs to the relief demanded.

The judgment should be reversed and a new trial ordered, with costs to the appellants to abide the event.

MARTIN, P. J., and TOWNLEY, J., concur; O'MALLEY and GLENNON, JJ., dissent and vote to affirm.

Judgment reversed and a new trial ordered, with costs to the appellants to abide the event.